UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


HAMILTON COUNTY EMERGENCY )
COMMUNICATIONS DISTRICT, )
 )
        Plaintiff, )
 )
v. )
 )   No. 1:04-CV-7
ORBACOM COMMUNICATIONS )
INTEGRATOR CORPORATION, )   Judge Curtis L. Collier
ORBACOM SYSTEMS, INC., OCI )
LIQUIDATING LLC, IPC INFORMATION )
SYSTEMS HOLDING, INC., HERBERT )
COHEN, and RONALD NEWFIELD, )
 )
        Defendants. )


## **MEMORANDUM**

Before the Court is Plaintiff Hamilton County Emergency Communications District's ("Plaintiff") motion for summary judgment (Court File No. 221). In its motion, Plaintiff moves for summary judgment on its claims under (1) the Uniform Fraudulent Transfer Act ("UFTA"), Tenn. Code Ann. § 66-3-301, *et seq.*, N.J. Stat. Ann. § 25:2-20, *et seq.*;[1] (2) the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-8-101, *et seq.*; and (3) Counts II and III of the Complaint. Plaintiff filed a brief in support of its motion (Court File No. 222). Defendants

---

[1] Both parties agree for purposes of this litigation, the relevant portions of the Tennessee UFTA and the New Jersey UFTA are the same (Court File No. 216, p. 13; Court File No. 219, p. 12 n. 10; *see* Court File No. 222, pp. 5-7 (citing only the Tennessee version of the UFTA)). Therefore, in resolving the current motions, the Court will cite exclusively to the Tennessee UFTA.

Orbacom Communications Integrator Corp. ("OCI"), OCI Liquidating LLC ("OCIL"), Herbert Cohen ("Cohen"), and Ronald Newfield ("Newfield") (collectively "Cohen Defendants") filed a brief in response (Court File No. 243). Defendants Orbacom Systems, Inc. ("OSI") and IPC Information Systems Holdings, Inc. ("IPC") filed a brief in response (Court File No. 244) and Plaintiff filed a reply brief (Court File No. 264).[2]

Also before the Court is a motion for summary judgment (Court File No. 215) filed by OSI and IPC. In their motion, OSI and IPC seek to dismiss all claims alleged against them under the UFTA. OSI and IPC filed a brief in support of their motion (Court File No. 216), Plaintiff filed a response (Court File No. 245), and OSI and IPC filed a reply (Court File No. 262).

Finally, before the Court is a motion for summary judgment (Court File No. 219, Part 1) filed by the Cohen Defendants. In this motion, the Cohen Defendants seek to dismiss all claims alleged against them under the UFTA. The Cohen Defendants filed a brief in support of their motion (Court File No. 219, Part 2), Plaintiff filed a response (Court File No. 246), and the Cohen Defendants filed a reply (Court File No. 261).[3]

After careful consideration of the above motions and briefs, and for the following reasons, The Court will (1) **GRANT IN PART, DENY IN PART,** and **RESERVE RULING IN PART** on Plaintiff's motion for summary judgment; and (2) **GRANT IN PART, DENY IN PART,** and **RESERVE RULING IN PART** on the Defendants' motions for summary judgment. Specifically,

---

[2] The Court will collectively refer to OCI, OCIL, Cohen, Newfield, OSI, and IPC as "Defendants".

[3] Three other summary judgment motions are currently pending before the Court (*See* Court File Nos. 223, 238, 240). For the sake of clarity, the Court will not address these motions in the current Memorandum.

the Court will

(1) **GRANT** Plaintiff's motion for summary judgment on Plaintiff's § 66-3-306(a) UFTA claims based on the October 1, 2004 transactions;

(2) **DENY** Plaintiff's motion for summary judgment on Counts II and III of the Complaint;

(3) **RESERVE RULING IN PART** on Plaintiff's motion with respect to Plaintiff's TCPA claims;

(4) **GRANT** the Defendants' motions with respect to all UFTA claims not based on § 66-3-306(a);

(5) **GRANT** the Cohen Defendants' motion regarding UFTA claims based on 2002 transfers;

(6) **RESERVE RULING IN PART** the Cohen Defendants' motion regarding the 2003 transfers to Cohen and Newfield;

(7) **DENY** the Defendants' motions regarding pre-October 1, 2004 transfers taking place after Plaintiff's claim arose and post-October 1, 2004 transfers; and

(8) **DENY** the Defendants' motions with respect to § 66-3-306(a) claims based on the October 1, 2004 transactions.

I. <u>**STANDARD OF REVIEW**</u>

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issue of material fact exists, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed.

2d 265 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323, 106 S.Ct. at 2552.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S. Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.     RELEVANT FACTS

Plaintiff is a public Tennessee corporation charged with the statutory responsibility of creating and managing the emergency communications system for the citizens of Hamilton County, Tennessee (Court File No. 235, Fourth Amended Complaint, ¶ 3; *see* Court File No. 242, Answer to Fourth Amended Complaint, ¶ 3). Plaintiff "is engaged in a critical public safety function that requires effective receipt, processing, and communication of requests for emergency police, fire, and

ambulance services" (*Id.*). In early 2001, Plaintiff decided to replace its telephony and computer assisted dispatch ("CAD") system.[4] To start the process, Plaintiff prepared a Request for Proposals ("RFP") which was distributed to potential vendors (Court File No. 134, Exh. A). Plaintiff was not satisfied with the responses it received from potential vendors, so it retained a consulting firm, L. Robert Kimball & Associates ("Kimball") to prepare a new RFP (Court File No. 134, Exh. B, Deposition of Mark Martorano ("Martorano Dep.") at 11-23; Court File No. 134, Exh. C, Terry Johnston Deposition ("Johnston Dep.") at 15-17). The new RFP was sent out in 2002. One of the potential vendors, OCI, submitted a proposal. In March 2002, Plaintiff's Board of Directors ("Board") voted to accept the OCI proposal and authorized Kimball to assist Plaintiff in negotiating a final agreement (Brumit Dep. at 37, 39-40; Martorano Dep. at 33-36; Court File No. 134, Exh. H). During these negotiations, it was decided the telephony system would be installed first,[5] followed by the CAD system (Brumit Dep. at 45-46). Further, Plaintiff decided to have its own personnel responsible for data conversion and entry into the database used in the CAD system (*Id.* at 38; Watkins Dep. at 37).[6] Eventually, on March 23, 2002 Plaintiff and OCI signed an agreement (hereinafter "Contract") consisting primarily of OCI's response to Plaintiff's 2002 RFP (Court File No. 41, Exh. A). An attachment was made part of the Contract and dated April 17, 2002.[7] The

---

[4] A CAD system is designed to permit emergency communication operators to efficiently dispatch calls to appropriate response personnel and is important to the identification of the location of emergency callers using mobile telephones (Court File No. 41, p. 3).

[5] Plaintiff has accepted and is satisfied with the telephony software which was provided and installed by a subcontractor, Positron Public Safety Systems Corporation.

[6] The data consisted of administrative data for incidents, units, and common-place information as well as GIS/Mapping data (Court file No 41, p. 4).

[7] OCI originally admitted the attachment made part of the Contract was entered into on April 17, 2002 but it later amended its Answer to deny the attachment was executed on April 17, 2002

5

Contract required OCI to provide computer hardware and operating system software on which the CAD system would be operated (Court File No. 108). Further, Plaintiff agreed to make periodic payments based on the completion of specified "milestones" (*See* Contract, Attachment A).

The project proceeded in 2002, albeit with delays, beginning with the installation of computer hardware and the telephony software. According to John J. Hines ("Hines"), the President of OCI, the CAD software was installed and invoiced to Plaintiff by December 23, 2002 (Court File No. 55, Affidavit of John J. Hines ("Hines Aff.") at ¶ 16). In January 2003, new consultants from Kimball, Leonard Kowalski ("Kowalski") and Ervin Dinsmore ("Dinsmore"), took over the project (Court File No. 146, p. 7; Court File No. 134, p. 6; Hines Aff. at ¶ 19). Later that month, Kowalski advised Plaintiff not to make any additional payments to OCI because the payments had proceeded ahead of implementation (Court File No. 134, Exh. L). Allegedly, Plaintiff took Kowalski's advice and refused to make some milestone payments despite the completion of some milestones (Court File No. 134, Exh. AJ; Court File No. 134, p. 7). In February 2003, OCI attempted to demonstrate the functionality of its CAD system to the individuals who would use the system. The demonstration went poorly and the users became upset because the CAD system did not meet their expectations (Court File No. 134, Exh. N, Deposition of Mark Broadway ("Broadway Dep.") at 75-76, 79-80).

Eventually, Plaintiff's Board held a meeting on July 9, 2003 and by resolution found that OCI was in breach of the contract and noted OCI was unable to fully perform under the Contract (Court File No. 41, Exh. F). The Board concluded OCI's failure to perform constituted an

---

(Court File No. 108). In its briefs, OCI does not give an alternative date as to when the attachment portion of the Contract was executed.

emergency because "the CAD System is a necessary and vital component of the emergency communications system upon which depends the safety and security of all Hamilton County citizens and the emergency agencies that serve these citizens" (*Id.*). The Board then stated "we do hereby find OCI to be in default of its obligations under the [Contract]..." (*Id.*). OCI contends it would have completed its duties under the Contract on time if Plaintiff had given OCI the data required to test and accept the system (Hines Aff. at ¶ 31). As late as June 19, 2003 Plaintiff had not given the required data to OCI (*Id.*).

Plaintiff filed suit against OCI on December 12, 2003 seeking (a) injunctive relief, (b) reimbursement of monies paid to OCI in the amount of $568,382.43, (c) "just and proper damages resulting from OCI's breach", (d) prejudgment interest, and (e) "attorneys' fees" (Court File No. 1, Complaint, at pp. 6-9).

In 2004 IPC became interested in acquiring OSI and software products developed by OCI. In the summer of 2004, IPC approached Cohen, the majority shareholder of both OCI and OSI, about acquiring OSI (Court File No. 215, Exh. E, Affidavit of John McSherry ("McSherry Aff.") at ¶ 5). Initially, Cohen was not interested but he was willing to entertain IPC's overtures about a possible sale (*Id.*). Extensive negotiations ensued and IPC conducted due diligence of OSI (*Id.* at ¶¶ 5-6). IPC discovered certain software used in the OSI business was actually owned by OCI and licensed to OSI in return for a royalty payment (*Id.* at ¶ 6). IPC made it clear that a key component of the transaction was for it to acquire the rights to the OCI software which meant OSI had to acquire these rights prior to IPC's purchase of OSI. In doing so, IPC would be able to acquire the OCI software without having to make royalty payments to OCI (*Id.*). Cohen agreed, and told IPC that OSI and OCI were going to reorganize (*Id.* at ¶ 7). IPC then tentatively agreed it would make

7

an initial payment of $11,000,000 ($3,000,000 would be held back to cover liabilities), and possible additional payments up to $7,000,000 depending on the financial performance of OSI after the sale (Court File No. 215, Exh. G).

On October 1, 2004, OCI and OSI entered into an Agreement and Plan of Reorganization ("Reorganization") (Court File No. 215, Exh. H). The Reorganization provided OCI would liquidate and merge with OCI Liquidating LLC ("OCIL") after OCI's stockholders approved of the Reorganization (*Id.* at p. 4). Further, OCI was to transfer substantially all of its assets to OSI but OCI was to retain its liabilities (*Id.* at pp. 1-2). In return, OCI was to receive 50% of the issued and outstanding shares of OSI (*Id.* at p. 1).

On October 1, 2004 Cohen and Newfield signed a stock certificate transferring the OSI stock to OCIL instead of OCI (Court File No. 222, Exh. F). Also on October 1, 2004, IPC, OSI, Cohen, OCIL, and other OSI stockholders entered into a Stock Purchase Agreement ("SPA") (Court File No. 219, Exh. 5, Stock Purchase Agreement). The SPA provided for the sale of all OSI stock to IPC, including the OSI stock held by OCIL (*Id.* at p. 1). The stock sale was originally scheduled to take place on October 29, 2004 (*Id.* at p. 4). Further, on October 1, 2004 Cohen and Newfield signed a Plan of Merger which provided OCI would not be merged into OCIL until December 31, 2004 (Court File No. 245, Exh. G).

For various reasons, the SPA closing date was pushed back. On November 16, 2004 Plaintiff sent a letter to IPC's general counsel requesting IPC not to take any actions that might improperly diminish or divert OCI's assets (Court File No. 215, Exh. K). On November 30, 2004, IPC, OSI, Cohen, OCIL and other OSI stockholders entered into an Amended Stock Purchase Agreement ("ASPA") which was the same as the APA except that it required OCI and Cohen to retain a least

8

$600,000 in cash reserve in OCIL until the current litigation was resolved (Court File No. 219, Exh. 6, § 4.13; McSherry Aff. at ¶ 13). The ASPA provided OCIL would receive approximately $4,000,000 for its OSI stock at closing (Court File No. 219, Exh. 6, Exh. A). Further, OCIL had the potential to receive a maximum of approximately $5,000,000 if enough OSI products were sold during the twelve-month period after the closing date. (Court File No. 219, Exh. 6, pp. 1-2). The ASPA closed on November 30, 2004. The Plan of Merger was included in the ASPA closing documents delivered to IPC on November 30, 2004 (Court File No. 245, Exh. D).

### III.   DISCUSSION

#### A.   UFTA Claims

Plaintiff claims the UFTA was violated by the Defendants when certain transfers took place between 2002 and 2004 (Court File No. 235, Fourth Amended Complaint, ¶¶ 44-63). Plaintiff has moved for summary judgment on one portion of its UFTA claims. Defendants have moved for summary judgment on all of Plaintiff's UFTA claims.

##### 1.   Plaintiff's Motion

Plaintiff argues the October 1, 2004 transactions amount to a violation of Tenn. Code Ann. § 66-3-306(a). Tenn. Code Ann. § 66-3-306(a) provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Specifically, Plaintiff contends OCI received no equivalent value in exchange for transferring

9

substantially all of its assets to OSI on October 1, 2004 and the transfer rendered OCI insolvent.[8]

The Defendants argue Plaintiff's view of the October 1, 2004 transactions and subsequent transactions is too formalistic. Although the Defendants admit OCI was left without any assets on October 1, 2004, they argue it was clear on October 1, 2004 OCI was a dead entity that would merge into OCIL, an entity which had enough assets to satisfy Plaintiff's claims.

The Court has determined the October 1, 2004 transactions violated § 66-3-306(a). On October 1, 2004 OCI transferred substantially all of its assets to OSI but it received nothing in return. The stock that was supposed to go to OCI went to OCIL. Thus, it is clear OCI transferred its assets "without receiving a reasonably equivalent value in exchange for the transfer...." Tenn. Code Ann. § 66-3-306(a). While it is true OCI eventually merged with OCIL on December 31, 2004, by that time OCIL only had $600,000 left in cash reserves.[9] $600,000 is a far cry from the $4,000,000 OCI would have received if the OSI stock was transferred to OCI. Therefore, even if the Court considered the $600,000 as a payment to OCI in return for OCI transferring its assets to OSI, it would be absurd for the Court to conclude the $600,000 payment was a "reasonably equivalent value." *Id.*; *See Bigger v. Fields*, 2005 WL 2043762, at *3-*4 (Tenn. Ct. App. Aug. 24, 2005) (stating "[i]n determining whether consideration is inadequate, courts do not apply a

---

[8] There is no dispute at this point in the litigation that Plaintiff is a "creditor" and OCI is a "debtor" as defined by the UFTA. A creditor is defined as "a person who has a claim." Tenn. Code Ann. § 66-3-302(4). A debtor is defined as "a person who is liable on a claim." Tenn. Code Ann. § 66-3-302(6).

[9] The Cohen Defendants argue in a reply brief OCIL may have had more than $600,000 in assets on December 31, 2004 (Court File No. 261, p. 7). In support of this argument they refer to a document which appears to be a bank account in the name of OCIL with an account balance of $2,514,343.77 (Court File No. 261, Exh. D). However, this document is dated December 8, 2004. Further, this argument contradicts all of the other briefs which assume OCIL only had $600,000 in cash reserve on and after December 31, 2004.

mathematical formula but consider the circumstances of the particular case"(citing *Meachem v. Haley*, 270 S.W.2d 503 (Tenn. Ct. App. 1954)).

Further, it is evident OCI became insolvent on October 1, 2004. Tenn. Code Ann. § 66-3-303 defines insolvency in relevant part as follows:

> A debtor is insolvent if the sum of the debtor's debts[10] is greater than all of the debtor's assets, at a fair valuation.

Tenn. Code Ann. § 66-3-303(a). On October 1, 2004 OCI transferred its assets but retained its liabilities. Among its liabilities was the current lawsuit which was pending on October 1, 2004. Thus, OCI was obviously insolvent from October 1, 2004 until December 31, 2004. During this time period, OCI had more debts than assets as defined by the Tennessee UFTA. This period of insolvency was a direct result of the October 1, 2004 transactions.

The Court notes the Defendants strenuously argue OCI was solvent after October 1, 2004 because OCIL was required to retain $600,000 in cash reserve and OCIL could potentially receive up to $5,000,000 in cash from IPC if enough OSI products were sold. This argument is unpersuasive. As already stated, OCI had no assets between October 1, 2004 and December 31, 2004. Thus, by definition, the October 1, 2004 transactions left OCI insolvent, at least temporarily. Further, the $600,000 in cash reserve plus the possibility of up to $5,000,000 in payments from IPC did not necessarily guarantee OCIL's solvency on or after December 31, 2004. Plaintiff's original Complaint demanded approximately $568,000 for monies paid to OCI, just and proper damages

---

[10] Debt is defined as "liability on a claim." Tenn. Code Ann. § 66-3-302(5). A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Tenn. Code Ann. § 66-3-302(3).

11

resulting from OCI's breach, prejudgment interest, and attorney's fees.[11] As such, it can easily be said on December 31, 2004, OCIL had potential liability, *i.e.*, was indebted to Plaintiff for much more than $600,000. As a result, on December 31, 2004, OCIL may well have been insolvent. Although OCIL had the potential to receive $5,000,000 in payments from IPC after December 31, 2004 the Court has not been informed what the likelihood of the potential payments were.[12] Further, it should have been anticipated by OCIL that its debts were going to increase before it received any payments from IPC. In fact, after December 31, 2004 OCIL's debts did increase when Plaintiff added several new claims against OCI/OCIL.

In light of the above, the Court concludes the October 1, 2004 transactions violated the UFTA. As a result, the Court will **GRANT** Plaintiff's motion for summary judgment with respect to Plaintiff's § 66-3-306(a) claims based on the October 1, 2004 transactions.

### 2. Defendants' Motions

The Defendants move for summary judgment on all of Plaintiff's UFTA claims. To the extent these motions seek to dismiss § 66-3-306(a) violations of the UFTA based on the October 1, 2004 transactions, they will be **DENIED**. To the extent the Defendants request the Court to dismiss all UFTA claims under Tenn. Code Ann. § 66-3-305, their motions will be **GRANTED**. Plaintiff

---

[11] The Defendants would have been wise to require OCIL to keep much more than $600,000 in cash reserve. The Plaintiff's original complaint, standing alone, could have easily resulted in an award greater than $600,000. Although the Defendants asserted a counter-claim there was no certainty the Defendants would prevail on their counter-claim. In fact, the Court dismissed a portion of the counter-claim in a previous memorandum and order. Further, as any defendant knows, it is very possible additional claims may be asserted as the litigation progresses.

[12] No evidence of any payments being made by IPC to OCIL in 2005 has been given to the Court despite the fact IPC has to pay OCIL immediately if certain sales targets are met and the cash from the sales has been collected by IPC (*See* Court File No. 215, Exh. L, pp. 1-2).

states in response to OSI's and IPC's motion for summary judgment, "OSI and IPC incorrectly assert that the provision of the [UFTA] applicable to the transfers described...is [Tenn. Code Ann.] § 66-3-305. ...[T]he UFTA provision applicable is [Tenn. Code Ann.] § 66-3-306" (Court File No. 245, p. 6; *see* Court File No. 246, p. 6 (stating "[a]s did IPC and OSI, [OCI, OCIL, Cohen, and Newfield] have incorrectly argued that [Plaintiff] must prove fraudulent intent in order to prevail on its UFTA claims. Simply stated, these Defendants are looking at the wrong section of the UFTA")). Since Plaintiff is content on resting its UFTA claims on § 66-3-306, the Court will **DISMISS** all other UFTA claims not based on § 66-3-306.

As previously discussed, the Court has determined the October 1, 2004 transactions violated § 66-3-306(a). However, there are several other transfers the Court must discuss to fully dispose of the Defendants motions for summary judgment.

### (a) Pre-October 1, 2004 Transfers

Plaintiff claims payments made to Cohen and Newfield in 2002 and 2003 violated the UFTA (Court File No. 235, Fourth Amended Complaint, ¶¶ 44, 58). Section § 66-3-306 only applies to claims arising before a transfer is made. *See* Tenn. Code Ann. § 66-3-306(a). Plaintiff's "claim" clearly did not arise in 2002 therefore any 2002 transfers could not have violated § 66-3-306(a). As for the 2003 transfers, the Court is unclear if they could have been in violation of § 66-3-306(a) because the dates of the transfers have not been provided to the Court. If the transfers were made in early 2003 they would not be in violation of the UFTA because Plaintiff's claim against OCI had not arisen. However, if the 2003 transfers were made in late 2003 when it was clear to OCI that Plaintiff was seeking reimbursement monies, those transfers may have been in violation of the UFTA. Accordingly, the Court will **DISMISS** any UFTA claims based on 2002 transfers but will

13

**RESERVE RULING** on transfers made in 2003.

Plaintiff alleges § 66-3-306(a) of the UFTA was violated when OCI transferred "more than Two Hundred Fifty Thousand Dollars...after OCI was notified of the [Plaintiff's] claim" (Court File No. 235, Fourth Amended Complaint, ¶ 58). The Cohen Defendants seek to dismiss this particular UFTA claim arguing (1) the transfers were made to repay loans that OCI made to Cohen and Newfield and (2) OCI was not insolvent as a result of the transfers.

The UFTA provides, "[v]alue is given for a transfer...if, in exchange for the transfer...antecedent debt is...satisfied." Tenn. Code Ann. § 66-3-304. Therefore, if the payments to Cohen and Newfield were simply repayments of loans the transfers would not violate § 66-3-306 of the UFTA.[13] However, the Cohen Defendants have presented insufficient evidence for the Court to conclusively determine the pre-October 1, 2004 transfers to Cohen and Newfield were made to repay loans. In support of their loan argument the Cohen Defendants cite Cohen's and Newfield's depositions (Court File No. 219, p. 22). Yet, the attached portions of the depositions do not mention any loans or pre-October 1, 2004 payments. In the Cohen Defendants' reply brief they make the same argument but cite only to Cohen's deposition (Court File No. 261, p. 5). However, the attached portion of the deposition only mentions a $30,000 loan and it does not reference Newfield (Court File No. 261, Exh. C, Deposition of Herbert Cohen, pp. 187-88). Nonetheless, even if the Newfield and Cohen depositions stated the pre-October 1, 2004 transfers were made to satisfy loans previously made to OCI, the Court still would not grant summary judgment. Contradicting the Cohen Defendants' argument, the December 31, 2003 and September 30, 2004 OCI balance sheets show notes payable as $0 (Court File No. 246, Exh. B, pp. 4, 9). Thus, insufficient evidence has

---

[13] Assuming the transfer was made for *reasonably equivalent* value.

been presented for the Court to conclusively determine the Cohen and Newfield transfers made before October 1, 2004, but after Plaintiff's claim arose, were in exchange for reasonably equivalent value.

Despite the previous conclusion, summary judgment is still warranted if the Cohen and Newfield transfers did not render OCI insolvent. Again, a company is insolvent under the UFTA if "the sum of the [company's] debts is greater than all of the [company's] assets, at a fair valuation." Tenn. Code Ann. § 66-3-303(a). On September 30, 2004 OCI's total assets were valued at $571,510.91 (*See* Court File No. 246, Exh. B, p. 7). As explained above, Plaintiff's original Complaint sought more than $600,000 in damages. Therefore, a reasonable juror could conclude OCI was insolvent as a result of the Cohen and Newfield transfers made prior to October 1, 2004. Accordingly, the Court will **DENY**, except as explained above, the Cohen Defendant's motion for summary judgment based on the pre-October 1, 2004 transfers to Cohen and Newfield.

### (b) Post-October 1, 2004 Transfers

Plaintiff alleges the November 30, 2004 transfer of stock from OCIL to IPC violated § 66-3-306(a) of the UFTA because it deprived OCI of the proceeds of the OSI stock and allowed OCIL to transfer the proceeds before it merged with OCI (*See* Court File No. 235, Fourth Amended Complaint, ¶ 60; Court File No. 245, pp. 6, 8). The Court believes a reasonable juror could reach this same conclusion. Viewing the facts in the best light possible for Plaintiff, the November 30, 2004 transfer was really part of the fraudulent October 1, 2004 transfer. After all, IPC set into motion the October 1, 2004 transactions when it refused to buy OSI unless OSI obtained OCI's software. Further, the initial SPA was signed on October 1, 2004 suggesting it was really part of the fraudulent OCI-OSI-OCIL transfer. Although IPC paid fair value for the OSI stock it did not

15

give any of the money to OCI. In addition, since IPC did not pay OCI on November 30, 2004, OCI remained insolvent. In short, it might appear to a reasonable juror the November 30, 2004 transfer was just an extension of the fraudulent October 1, 2004 transfer. *Cf. Orlando Residence, Ltd. v. Nashville Lodging Co.*, 104 S.W.3d 848, 853 (Tenn. Ct. App. 2002) (stating in the context of a fraudulent real property conveyance, "[i]f the creditor can sue the fraudulent grantee, it must follow he can sue the fraudulent grantors *and those who conspire with them* to defeat the creditor's claims" (emphasis added)).

Plaintiff also contends the transfers to Cohen and Newfield of the proceeds of the OSI stock sold to IPC by OCIL violated the UFTA. For very similar reasons to those just stated, these transfers could be viewed by a reasonable juror as part of the October 1, 2004 fraudulent transfer. Cohen and Newfield were intimately part of almost every transaction at issue in this case. It was clear to them when they took payments from OCIL they were in essence depriving OCI of the proceeds. If Cohen and Newfield conspired to make OCI judgment proof through this elaborate series of transactions, it makes perfect sense for a juror to conclude the stock proceed transfers were violative of § 66-3-306(a).

Finally, OSI and IPC argue if the November 30, 2004 transfer somehow violates the UFTA, judgment cannot be entered against OSI or IPC because both OSI and IPC were subsequent good-faith transferees. The UFTA provides certain defenses to transferees. The UFTA states in relevant part as follows:

> [T]o the extent a transfer is voidable in an action by a creditor...[t]he judgment may be entered against:
>
> (1) The first transferee of the asset or the person for whose benefit the transfer was made; or

16

> (2) Any subsequent transferee *other than a good-faith transferee* or obligee *who took for value* or from any subsequent transferee or obligee.

Tenn. Code Ann. § 66-3-309(b) (emphasis added). OSI and IPC have not proven the above defense at this stage of the litigation. There is simply too much evidence suggesting OSI and IPC were not "good-faith" transferees. This evidence is adequately summarized by Plaintiff in its response (Court File No. 245, p. 9). However, the Court would like to highlight a few points already made by Plaintiff. OSI knowingly took all of OCI's assets without giving OCI anything in return. Instead, in violation of the terms of the Reorganization, OSI transferred half of its stock to OCIL. That alone, prevents the Court from concluding at this stage of the litigation OSI was a good-faith transferee. As for IPC, viewing the facts in the best light possible for Plaintiff, because of IPC's close involvement with the October 1, 2004 transactions, it likely knew the OSI stock was supposed to be transferred to OCI, not OCIL, and therefore OCI should be getting paid for the OSI stock. Further, since IPC had the Plan of Merger it must have known if it paid OCIL instead of OCI, OCI would be penniless. Accordingly, the Court will **DENY** the Defendants' motions for summary judgment based on the post-October 1, 2004 transfers.

### B. Violations of the TCPA

Plaintiff moves for summary judgment on its TCPA claims. For the sake of clarity, the Court will address this portion of Plaintiff's motion in a separate Memorandum and Order. Thus, the Court will **RESERVE RULING IN PART** on the TCPA portion of Plaintiff's motion for summary judgment.

### C. Counts II and III of the Complaint

Plaintiff argues it is entitled to reimbursement of monies paid to OCI (Court File No. 235, Fourth Amended Complaint, ¶ 32). The Contract provides:

17

> [OCI] shall reimburse [Plaintiff] all monies paid to date in the event [OCI] fails to meet or comply with the specifications and requirements agreed to in the OCI Request for Proposal Response Dated March 1, 2002 and attachment "A" dated April 17, 2002.

(Court File No. 41, Exh. A, p. 2). Plaintiff contends OCI failed to meet or comply with the requirements of the Contract and consequently owes Plaintiff $568,382.43 (Court File No. 235, Fourth Amended Complaint, ¶ 32). Also, Plaintiff states it is entitled to damages because OCI breached the Contract (*Id.* at ¶¶ 36-37).

In Plaintiff's motion for summary judgment it argues the Court should give deference to the Board's finding that OCI was in default of its obligations (Court File No. 222, pp. 9-12). If the Court defers to Plaintiff's Board, OCI would be required to repay Plaintiff and OCI would be responsible for breach of contract damages.

Plaintiff is a municipal corporation created under and existing pursuant to Tenn. Code Ann. § 7-86-101, *et seq.*. Plaintiff is charged with the statutory responsibility of creating and managing the emergency communications system for the citizens of Hamilton County, Tennessee. Therefore, Plaintiff argues, its determination that OCI was in default was a governmental decision that should be upheld by the Court unless the decision was clearly illegal, arbitrary, or capricious.

In making its argument, Plaintiff relies on *McCallen v. City of Memphis*, 786 S.W.2d 633 (Tenn. 1990). In *McCallen* the Memphis City Council granted a permit to a developer to build a planned development. Some landowners brought a complaint for declaratory judgment. *Id.* at 637-38. The Tennessee Supreme Court determined the Memphis City Council was acting in an administrative capacity. Therefore, the Tennessee Supreme Court reviewed the City Council's decision under an "illegal, arbitrary and capricious" standard. *Id.* at 639-41. The Court explained:

> [T]he court's primary resolve is to refrain from substituting its judgment for that of

18

> the local governmental body. An action will be invalidated only if it constitutes an abuse of discretion. ...Both legislative and administrative decisions are presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action.

*Id.* at 641. *McCallen* is inapposite to the current case. Unlike the Memphis City Council, Plaintiff is not a governmental legislative body. Also, when Plaintiff's Board determined OCI was in default of the Contract it was not operating in an administrative capacity. In addition, the Board's determination that OCI breached the Contract is wholly unrelated to zoning ordinances or the granting of a permit. Finally, nowhere in Tenn. Code Ann. § 7-86-101 *et seq.* has Plaintiff or its Board been given the discretion to find someone in a contractual relationship with Plaintiff in default.

Unsurprisingly, Plaintiff does not cite, and the Court was unable to find, any cases where a court deferred to a municipal corporation's determination that someone it had a contractual relationship with breached the contract. Plaintiff has the right to enforce the contracts in enters into, not the power to determine the rights and the obligations of the parties it contracts with. *See S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 716-17 (Tenn. 2001) (stating "when the law gives the power and right to contract, the right to enforce such contract necessarily and as a matter of course follows. The power to enforce that contract...includes the authority to seek full *judicial* determination of the respective rights and obligations of the parties..." (emphasis added) (internal citation and quotation omitted)); *Cf. Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1571 (D.C. Cir. 1987) (stating "if the agency itself were an interested party to the agreement, deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract"). Regardless, even if deference was the normal course of action, the Court would not defer to Plaintiff's decision in this case because Plaintiff possibly

19

caused OCI to breach the Contract. Accordingly, the Court will **DENY** Plaintiff's motion for summary judgment on this ground.

IV. <u>CONCLUSION</u>

In light of the above reasoning, the Court will (1) **GRANT IN PART, DENY IN PART,** and **RESERVE RULING IN PART** Plaintiff's motion for summary judgment; and (2) **GRANT IN PART, DENY IN PART,** and **RESERVE RULING IN PART** the Defendants' motions for summary judgment. Specifically, the Court will (1) **GRANT** Plaintiff's motion for summary judgment on Plaintiff's § 66-3-306(a) UFTA claims based on the October 1, 2004 transactions; (2) **DENY** Plaintiff's motion for summary judgment on Counts II and III of the Complaint; (3) **RESERVE RULING IN PART** on Plaintiff's motion with respect to Plaintiff's TCPA claims; (4) **GRANT** the Defendants' motions with respect to all UFTA claims not based on § 66-3-306(a); (5) **GRANT** the Cohen Defendants' motion to dismiss UFTA claims based on 2002 transfers; (6) **RESERVE RULING IN PART** on the Cohen Defendants' motion regarding the 2003 transfers to Cohen and Newfield; (7) **DENY** the Defendants' motions regarding pre-October 1, 2004 transfers taking place after Plaintiff's claim arose and post-October 1, 2004 transfers; and (8) **DENY** the Defendants' motions with respect to § 66-3-306(a) claims based on the October 1, 2004 transactions.

An order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**