# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### at CHATTANOOGA

| | |
|---|---|
| HAMILTON COUNTY EMERGENCY COMMUNICATIONS DISTRICT, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 1:04-CV-7 |
| ORBACOM COMMUNICATIONS INTEGRATOR CORPORATION, ORBACOM SYSTEMS, INC., OCI LIQUIDATING LLC, IPC INFORMATION SYSTEMS HOLDING, INC., HERBERT COHEN, and RONALD NEWFIELD, ) ) ) ) ) ) ) | Chief Judge Curtis L. Collier |
| Defendants. ) | |

## M E M O R A N D U M

Before the Court is a portion of Plaintiff Hamilton County Emergency Communications

District's ("Plaintiff") motion for summary judgment (Court File No. 221).[1]  In its motion, Plaintiff

moves for summary judgment on its claims under the Tennessee Consumer Protection Act

("TCPA"), Tenn. Code Ann. § 47-8-101, *et seq.*. Plaintiff filed a brief in support of its motion (Court

File No. 222).  Defendants Orbacom Communications Integrator Corp. ("OCI"), OCI Liquidating

---

[1] The Court previously ruled on much of Plaintiff's motion for summary judgment (*See* Court File Nos. 271, 272).  However, the Court reserved ruling on the Tennessee Consumer Protection Act ("TCPA") portion of Plaintiff's motion (*Id.*).  The current memorandum will address the TCPA portion of Plaintiff's motion.

LLC ("OCIL"),[2] Herbert Cohen ("Cohen"), and Ronald Newfield ("Newfield") (collectively "Defendants") filed a brief in response (Court File No. 243) and Plaintiff filed a reply brief (Court File No. 264).

Also before the Court is a motion for summary judgment filed by OCI (Court File No. 223). In this motion, OCI seeks to dismiss (1) the portion of Plaintiff's breach of contract claim that is based on OCI's failure to provide workstations containing Xeon processors; (2) all claims alleged against it under the TCPA; and (3) Count V of the Complaint, in which Plaintiff alleges an alternative count for fraud. OCI filed a brief in support of its motion (Court File No. 224), Plaintiff filed a response (Court File No. 247), and OCI filed a reply (Court File No. 263).[3]

After careful consideration of the above motions and briefs, and for the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiff's motion. Also, the Court will **GRANT IN PART** and **DENY IN PART** OCI's motion. Specifically the Court will

(1) **GRANT** Plaintiff's motion for summary judgment on its TCPA claims under § 47-18-104(b)(7) based on the invoicing of the staging, delivery, and installation of the workstations;

(2) **DENY** Plaintiff's motion for summary judgment on its TCPA claims under § 47-18-104(b)(7) based on OCI's contractual promise to provide Plaintiff with Xeon processors and the ordering, delivery, and installation of the workstations;

(3) **GRANT** OCI's motion for summary judgment on Plaintiff's TCPA claims under § 47-18-104(b)(5) and § 47-18-104(b)(27);

(4) **GRANT** OCI's motion for summary judgment on Plaintiff's TCPA claims under § 47-18-104(b)(7) based on OCI's contractual promise to provide Plaintiff with Xeon processors and the

---

[2] In this memorandum, the Court will, except as otherwise noted, collectively and individually refer to OCI and OCIL as "OCI".

[3] Two other summary judgment motions are currently pending before the Court (*See* Court File Nos. 238, 240). For the sake of clarity, the Court will not address these motions in the current memorandum.

2

ordering, delivery, and installation of the workstations;

(5) **DENY** OCI's motion for summary judgment on Plaintiff's breach of contract claim;

(6) **DENY** OCI's motion for summary judgment on Plaintiff's TCPA claims based on the applicable statute of limitations;

(7) **DENY** OCI's motion for summary judgment on Plaintiff's TCPA claims based on OCI's remedy arguments; and

(8) **DENY** OCI's motion for summary judgment on Plaintiff's TCPA claims under § 47-18-104(b)(7) for the invoicing of the staging, delivery, and installation of the workstations.

## I.  STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the burden is on the moving party to conclusively show no genuine issue of material fact exists, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  *Id.* at 323, 106 S.Ct. at 2552.

The Court determines whether sufficient evidence has been presented to make the issue of

fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S. Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

II.     **RELEVANT FACTS**

Plaintiff is a public Tennessee corporation charged with the statutory responsibility of creating and managing the emergency communications system for the citizens of Hamilton County, Tennessee (Court File No. 235, Fourth Amended Complaint, ¶ 3; *see* Court File No. 242, Answer to Fourth Amended Complaint, ¶ 3). Plaintiff "is engaged in a critical public safety function that requires effective receipt, processing, and communication of requests for emergency police, fire, and ambulance services" (*Id.*). In early 2001, Plaintiff decided to replace its telephony and computer assisted dispatch ("CAD") system.[4] To start the replacement process, Plaintiff prepared a Request

_____

[4] A CAD system is designed to permit emergency communication operators to efficiently dispatch calls to appropriate response personnel and is important to the identification of the location of emergency callers using mobile telephones (Court File No. 41, p. 3).

4

for Proposals ("RFP") which was distributed to potential vendors (Court File No. 134, Exh. A). Plaintiff was not satisfied with the responses it received from potential vendors, so it retained a consulting firm, L. Robert Kimball & Associates ("Kimball") to prepare a new RFP (Court File No. 134, Exh. B, Deposition of Mark Martorano ("Martorano Dep.") at 11-23; Court File No. 134, Exh. C, Terry Johnston Deposition ("Johnston Dep.") at 15-17). Kimball assigned Mark Martorano ("Martorano") and Terry Johnston ("Johnston") to assist Plaintiff. The new RFP was sent out in 2002. One of the potential vendors, OCI, submitted a proposal. In March 2002, Plaintiff's Board of Directors ("Board") voted to accept the OCI proposal and authorized Kimball to assist Plaintiff in negotiating a final agreement (Court File No. 134, Exh. D, Nola Brumit Deposition ("Brumit Dep.") at 37, 39-40; Martorano Dep. at 33-36; Court File No. 134, Exh. H). During these negotiations, it was decided the telephony system would be installed first,[5] followed by the CAD system (Brumit Dep. at 45-46). Further, Plaintiff decided to make its own personnel responsible for data conversion and entry into the database used in the CAD system (*Id.* at 38; Court File No. 134, Exh. F, Lee Watkins Deposition ("Watkins Dep.") at 37).[6] Eventually, on March 23, 2002 Plaintiff and OCI signed an agreement (hereinafter "Contract") consisting primarily of OCI's response to Plaintiff's 2002 RFP (Court File No. 41, Exh. A). An attachment was made part of the Contract and dated April 17, 2002.[7]

---

[5] Plaintiff has accepted and is satisfied with the telephony software which was provided and installed by a subcontractor, Positron Public Safety Systems Corporation ("Positron").

[6] The data consisted of administrative data for incidents, units, and common-place information as well as GIS/Mapping data (Court File No 41, p. 4).

[7] OCI originally admitted the attachment made part of the Contract was entered into on April 17, 2002 but it later amended its Answer to deny the attachment was executed on April 17, 2002 (Court File No. 108). In its briefs, OCI does not give an alternative date as to when the attachment portion of the Contract was executed.

The Contract required OCI to provide computer hardware and operating system software on which the CAD system would be operated (Court File No. 108). Included in the Contract by reference were workstation hardware specifications. These specifications stated the workstations would, at a minimum, contain computers with Xeon processors (Court File No. 224, Exh. C, p. 6; Court File No. 222, Exh. J, p. 5). In June 2002, OCI began ordering the computer hardware. Instead of ordering Xeon processors, OCI ordered Intel Pentium processors (Court File No. 224, p. 3).[8] On the front of the computer towers were stickers indicating the manufacturer and type of processors inside the computer (Court File No. 224, Exh. E). The workstations were delivered in boxes (Court File No. 247, Exh. G, Affidavit of Lee Watkins ("Watkins Aff.") at ¶ 4). The installation of the workstations was arranged by OCI (*Id.*). Most of the workstations were installed in locked cabinets in Plaintiff's call center and a few of the workstations were placed under desks in Plaintiff's emergency operations center (*Id.*). According to Plaintiff, for a person to see the sticker on the front of the computer tower, he would have to get on his knees or stomach and shine a flashlight on the computer tower (*Id.* at ¶ 6). Lee Watkins ("Watkins") states he did not discover the workstations contained Pentium processors until the fall of 2004 (*Id.* at ¶ 7).

According to John J. Hines ("Hines"), the President of OCI, the CAD software was installed and invoiced to Plaintiff by December 23, 2002 (Court File No. 55, Affidavit of John J. Hines ("Hines Aff.") at ¶ 16). In January 2003, new consultants from Kimball, Leonard Kowalski ("Kowalski") and Ervin Dinsmore ("Dinsmore"), took over the project (Court File No. 146, p. 7; Court File No. 134, p. 6; Hines Aff. at ¶ 19). Later that month, Kowalski advised Plaintiff not to

---

[8] Two of the workstations had Xeon processors (Court File No. 224, pp. 3-4; Court File No. 247, Exh. G, Watkins Aff. at ¶ 5).

make any additional payments to OCI because the payments had proceeded ahead of OCI's implementation (Court File No. 134, Exh. L). Plaintiff alleges it took Kowalski's advice and refused to make certain milestone payments despite the completion of some milestones (Court File No. 134, Exh. AJ; Court File No. 134, p. 7).

In February 2003, OCI attempted to demonstrate the functionality of its CAD system to the individuals who would use the system. The demonstration went poorly and the users became upset because the CAD system did not meet their expectations (Court File No. 134, Exh. N, Deposition of Mark Broadway ("Broadway Dep.") at 75-76, 79-80). The users were upset because the CAD system did not provide the functionality they expected it to provide and the CAD system was much different from what they were using at the time. Specifically, the system did not satisfy the requirements of the 2001 RFP which complied more with the users' idea of how the CAD system should operate (Broadway Dep. at 83-84; Court File No. 134, Exh. O, Deposition of William Toth ("Toth Dep.") at 202-03; Watkins Dep. at 57; Brumit Dep. at 126-27). The users' complaints were discussed at Plaintiff's Board meeting in March 2003 and it was suggested Kimball did not thoroughly review the 2002 RFP before releasing it (Court File No. 134, Exh. Q, p. 2-3). After the Board meeting, Kowalski prepared a list of "Action Items" cataloging OCI's failure to comply with specifications of the 2002 RFP found in the Contract (Court File No. 146, Exh. K, Declaration of Len Kowalski ("Kowalski Decl.") at Exh. 1). While conducting his research into these failures, Kowalski first discovered the workstations were Dell Precision 340s (*See* Court File No. 224, Exh. N). In early June 2003 OCI responded in writing to each of the "Action Items" (Court File No. 134, Exh. AA).

Plaintiff's Board held a meeting on July 9, 2003 and by resolution found OCI was in breach

of the Contract and noted OCI was not going to fully perform under the Contract (Court File No. 41, Exh. F). In this same meeting, Kowalski said "the hardware you have in place right now is suitable. And for a solution...you would have the Positron 9-1-1 system and a Positron CAD system that single set of hardware would be an adequate solution" (Court File No. 224, Exh. O, pp. 30-31). After terminating the Contract, Plaintiff contracted with Positron Public Safety Systems Corporation ("Positron") to replace the OCI CAD system with another CAD system.

Plaintiff filed suit against OCI on December 12, 2003. On January 12, 2004 Plaintiff's technology consultant, Sara Haase ("Haase"), stated in an email to Positron employees and Watkins she had checked Dell's website and discovered the workstations had 1.7Ghz processors (Court File No. 224, Exh. F). However, Haase states she did not learn the workstations had Pentium processors until the fall of 2004 (Court File No. 247, Exh. H, Affidavit of Sara Haase, ¶ 8). Plaintiff amended its complaint on March 16, 2005 adding claims under the TCPA and an "Alternative Count for Fraud" (*See* Court File No. 78, Second Amended Complaint). On October 25, 2005 Plaintiff filed a third amended complaint adding a claim for fraudulent concealment (*See* Court File No. 183, Third Amended Complaint).


III.     **DISCUSSION**

A.     **Breach of Contract**

OCI moves for summary judgment on Plaintiff's breach of contract claim insofar as it rests on OCI's failure to provide Plaintiff with Xeon processors. OCI argues the Contract did not require it to provide Plaintiff with Xeon processors. The Contract states in relevant part:

> 1. That [OCI] shall meet all the requirements, complete all the work and furnish all the material(s), equipment and labor necessary and required to furnish a Public

8

Safety Communications System as set forth by this Agreement **and as set forth in the OCI [RFP] Response** dated March 1, 2002....

(Court File No. 224, Exh. D (emphasis added)). The OCI RFP response included a hardware specification section. This section states in relevant part as follows:

The Hardware Specifications listed below are the minimum requirements needed to run basic Genisis I CAD and Records Management System packages. Any use of this hardware for any purpose other than to run Genisis 2001 must be addressed with OCI before purchase of the system.

...

Administrative Workstation Tower

| Qty | Description |
| --- | --- |
| 1 | Intel Xeon Processor, 1.70 Ghz |

...

CAD/RMS/MISSILE Workstation
Tower Workstation

| Qty | Description |
| --- | --- |
| 1 | Intel Xeon Processor, 1.7 Ghz or better |

...

(Court File No. 222, Exh. J (emphasis removed from original)).

OCI's basic argument is the Contract required it to provide the computer hardware needed to run the CAD system. So, as long as "OCI provided workstations sufficient to operate the specified software . . . it satisfied its obligations and its promise under the [Contract]" (Court File No. 224, p. 7). As for the hardware specifications section, OCI contends this section was intended to provide Plaintiff with a guide if it were to buy its own computer hardware and/or the hardware specification section merely provided the minimum requirements of the workstations, not the exact specifications of the workstations (*Id.*).

In Tennessee, "[i]f the contract is plain and unambiguous, . . . it is the court's function to

9

interpret the contract as written according to its plain terms." *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999). The Court is "precluded from making new contracts for the parties by adding or deleting provisions." *Warren v. Metro. Gov't*, 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997). "An ambiguity does not arise in a contract merely because the parties may differ as to interpretation of certain of its provisions." *Id.* (citing *Oman Constr. Co. v. Tennessee Valley Auth.*, 486 F.Supp. 375 (M.D. Tenn. 1979). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one; a strained construction may not be placed on the language used to find an ambiguity where none exists." *Id.* (citing *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973)).

With these principles in mind, the Court will now address OCI's arguments. OCI's first argument is the hardware specification section of the RFP response was merely a guide to help Plaintiff if it decided to purchase its own hardware. The Contract's plain language contradicts OCI's argument. The Contract clearly requires OCI to furnish a CAD system as set forth in the OCI RFP response. The hardware specification section is part of the RFP response. Therefore, OCI was required to furnish workstations as set forth in the hardware specification section. Moreover, OCI admits "under the [Contract] it was to provide computer hardware...on which...the CAD [system] would be operated" (Court File No. 108, p. 2). If the Contract required OCI to provide the hardware, why would the RFP response have a hardware guide for Plaintiff to purchase its own hardware? Thus, the Court concludes the hardware specification section of the Contract was not merely a hardware specification guide for Plaintiff to follow if Plaintiff decided to purchase its own hardware.

OCI's second argument is the hardware specification section merely provided minimum requirements but not exact requirements. The Court agrees the hardware specification section

10

provided only the minimum requirements because the hardware specification section specifically states the hardware specifications are minimum requirements. However, summary judgment is still not warranted on this issue.

According to the hardware specification section of the Contract, OCI had to provide Plaintiff, at a minimum, with Xeon processors. Contrary to OCI's contention, the minimum requirement was not for OCI to provide Plaintiff with a functional CAD system. If this were the case, then there would be no need for a hardware specification requirement section. OCI could meet the minimum processor requirement by providing Plaintiff with Xeon processors or processors equal to or better than Xeon processors. OCI has presented insufficient evidence for a reasonable juror to conclude a Pentium processor is equal to or better than a Xeon processor. In fact, in its brief, OCI admits a Pentium processor is inferior to a Xeon processor. OCI states "[t]he replacement workstations included Xeon processors, the speed of which was three times the minimum requirement set forth in OCI's 'Hardware Specifications'" (Court File No. 224, p. 20). By stating the Xeon processors were three times as fast as the Pentium processors OCI argues meet the minimum requirements, OCI implicitly admits a Pentium processor could not be equal to or better than a Xeon processor.

Further, in explaining why two workstations installed by OCI had Xeon processors, OCI states "the administrative workstations were to be used heavily in data entry for the building of the CAD database. Due to the significant data manipulation to be conducted with these workstations, OCI determined that Xeon processors should be used therein" (Court File No. 224, pp. 3-4). This statement suggests a Xeon processor is better equipped than a Pentium processor to handle large amounts of data. Accordingly, since OCI presented insufficient evidence to show OCI provided Plaintiff with processors equal to or better than Xeon processors, it has not shown it did not breach

this section of the Contract as a matter of law, and the Court will **DENY** OCI's motion for summary judgment on Plaintiff's breach of contract claim based on OCI's failure to provide Xeon processors.

## B.     TCPA Violations

Plaintiff claims the TCPA was violated when OCI ordered, installed, and invoiced Plaintiff for workstations containing Pentium processors instead of Xeon processors (*See* Court File No. 235, Fourth Amended Complaint, ¶¶ 65-75). Both Plaintiff and OCI have moved for summary judgment on Plaintiff's TCPA claims. For the following reasons the Court will **GRANT IN PART** and **DENY IN PART** Plaintiff's motion and OCI's motion.

### 1.     Statute of Limitations

Defendants assert Plaintiff's TCPA claims must fail because they are barred by the applicable statute of limitations. The TCPA explicitly requires "[a]ny action commenced pursuant to [the TCPA] shall be brought within one (1) year from a person's discovery of the unlawful act or practice . . . " Tenn. Code Ann. § 47-18-110. Discovery occurs when a party actually discovers the unlawful act or practice or should reasonably have discovered the unlawful act or practice. *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916-917 (Tenn. Ct. App. 2000). Plaintiff asserted its TCPA claims on March 16, 2005 when it filed its second amended complaint. Therefore, if Plaintiff discovered or should have discovered the workstations contained Pentium processors before March 16, 2004, its TCPA claims are barred.[9]

Defendants contend Plaintiff should have discovered the workstations contained Pentium processors by October 2002 because the workstations were shipped to Plaintiff before October 2002.

---

[9] Plaintiff does not argue or suggest its TCPA claims "relate back" to the original complaint filed on December 12, 2003. *See* Fed. R. Civ. P. 15(c).

Specifically, Defendants argue Watkins, Plaintiff's employee in charge of implementing the 911 system, was present when the computer hardware was delivered. Defendants' argument fails for two reasons. First, in support of their argument Watkins was present when the computer hardware was delivered to Plaintiff, Defendants cite William Toth's ("Toth") deposition (Court File No. 224, p. 12). However, the portion of Toth's deposition Defendants attached as an exhibit has nothing to do with the delivery of the computer hardware.[10] Second, even if Defendants had submitted evidence Toth claimed Watkins was present, Watkins had a limited role in the delivery of the workstations (Watkins Aff. ¶¶ 3, 4). This limited role, combined with the fact that the workstations were delivered in boxes, thereby concealing the Pentium stickers, would allow a reasonable juror to conclude it was reasonable for Watkins not to discover the Pentium processors when the workstations were delivered.

Defendants also argue Plaintiff should have discovered the Pentium processors by October 2002 because members of Plaintiff's staff were present when the workstations were being installed and because Watkins supervised the installation. Defendants point to the stickers on the front of the computer towers indicating the computer contains a Pentium processor. Viewing the facts in the best light possible for Plaintiff, the Court concludes a reasonable juror could decide it was reasonable for members of Plaintiff's staff and Watkins not to discover the Pentium processors during the installation of the workstations. Although members of Plaintiff's staff were present when the workstations were being installed by OCI, a typical staff member likely has little incentive or

---

[10] Similarly, Defendants cite Nola Brumit's deposition in support of the same argument in response to Plaintiff's motion for summary judgment but the attached portion of Ms. Brumit's deposition does not refer to Watkins or the delivery of the workstations (Court File No. 243, p. 17; *see* Court File No. 243, Exh. A).

reason to investigate what type of processor his or her workstation contains. While it may be true the stickers were on the front of the computer towers, Watkins states the stickers could not clearly be seen on an installed workstation unless a staff member crawled under the desk with a flashlight. As for Watkins, although he assisted in the installation of the workstations, his "only role in the installation . . . was to unlock the cabinets" (Watkins Aff. ¶ 4). With such a limited role, it was reasonable for Watkins not to discover the Pentium processors during the installation of the workstations. In short, there is enough conflicting evidence for a reasonable juror to conclude it was reasonable for Plaintiff not to discover the Pentium processors by October 2002.

Next, the Defendants state summary judgment on Plaintiff's TCPA claims is proper because the Pentium processors should have been discovered by Plaintiff by July 2003. The Defendants contend the following events demonstrate Plaintiff should have discovered the Pentium processors by that date: (1) In January 2003 Kowalski and Dinsmore reviewed the status of the project; (2) In February and March of 2003 OCI conducted a demonstration of the CAD system; (3) Kowalski evaluated the costs of the workstations and identified the workstations as Dell Precision 340s; and (4) Kowalski commented on the compatibility of the computer hardware with the Positron CAD system at the July 9, 2003 Board meeting. The Court is unpersuaded by these arguments. Each of the above events simply demonstrate Plaintiff *might have* discovered the Pentium processors at that time. For example, when OCI demonstrated the functionality of the CAD system, Plaintiff's employees or consultants may have seen a Pentium sticker. However, Defendants have not presented any evidence to the Court showing any of Plaintiff's employees or consultants did in fact see the stickers. Further, none of the above events, viewed in isolation or as a whole, demonstrate Plaintiff *should have* known about the Pentium processors. Put simply, there were no problems with

14

or related to the Pentium processors on or before July 2003. Therefore, it was reasonable for Plaintiff not to discover the Pentium processors when it reviewed the status of the project, OCI's compliance with the Contract, the costs of the workstations, or the compatibility of the computer hardware with the new Positron CAD system.

Lastly, Defendants argue Plaintiff actually knew or should have known about the Pentium processors in January 2004 when Haase researched the workstation specifications. According to Defendants, since Haase obtained the workstation specifications from Dell's website she would have had access to the processor information. Specifically, Defendants argue, when Haase pulled up the specifications of the workstations she could click on a "Processor" link and discover the workstations had Pentium processors. Assuming all of this is true, the Court still cannot grant summary judgment for OCI. Defendants have not presented any evidence Haase clicked on the processor link. Therefore, Haase may not have had actual knowledge of the Pentium processors. Further, since there were no problems with or related to the processors on or before January 2003, it may have been reasonable for Haase not to click on the processor link. In addition, Haase states the Dell website did not provide whether the processors were Xeon or Pentium processors and she did not discover the processors were Pentium processors until the fall of 2004 when the OCI workstations began to have "serious performance problems" (Haase Aff. ¶¶ 6-9). Thus, a reasonable juror might conclude Haase did not discover the Pentium processors in January 2004 and it was reasonable for Haase not to discover the Pentium processors until the fall of 2004.

In light of the above reasoning, the Court will **DENY** OCI's motion for summary judgment based on the statute of limitations argument. Since the Court concludes the statute of limitations does not bar Plaintiff's TCPA claims at this stage of the litigation, it will not address whether the

statute of limitations should be tolled by OCI's alleged fraudulent concealment.

### 2. Unfair or Deceptive Acts

The TCPA states "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices . . ." Tenn. Code Ann. § 47-18-104(a). The TCPA then lists numerous unfair or deceptive acts or practices. *See* Tenn. Code Ann. § 47-18-104(b). Plaintiff argues OCI violated one of these listed unfair or deceptive acts or practices when it promised to provide Plaintiff with Xeon processors, and when OCI ordered, installed, and invoiced Plaintiff for the workstations that contained Pentium processors. The listed unfair or deceptive act or practice Plaintiff relies upon is Tenn. Code Ann. § 47-18-104(b)(7). That section provides the following is unlawful and in violation of the TCPA: "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Tenn. Code Ann. § 47-18-104(b)(7). As a result of this alleged breach, OCI seeks to rescind the workstation portion of the Contract and obtain treble damages and attorney's fees (Court File No. 247, p. 17, n.6; *see* Court File No. 235, Fourth Amended Complaint, Count IV). OCI moves for summary judgment on all of Plaintiff's TCPA claims arguing it never made any misrepresentations and even if it did, Plaintiff has not suffered any injury as a result of OCI's alleged actions and rescission would be an inappropriate remedy.

Before addressing the above arguments, the Court notes Plaintiff does not rely on or cite Tenn. Code Ann. §§ 47-18-104(b)(5), (27)[11] in its summary judgment motion or in its response to OCI's motion for summary judgment. Instead, Plaintiff relies solely on § 47-18-104(b)(7) to support

---

[11] Each of these sections are cited by Plaintiff in its Fourth Amended Complaint (Court File No. 235, Fourth Amended Complaint, ¶ 71).

its TCPA claims. Since Plaintiff is content with basing its TCPA claims on § 47-18-104(b)(7), the Court will **GRANT IN PART** OCI's motion for summary judgment and **DISMISS** Plaintiff's §§ 47-18-104(b)(5), (27) TCPA claims.

"In order to be successful under the [TCPA], it must be proven that there was some deception, misrepresentation or unfairness, regardless of any breach of contract." *Office Furniture & Related Servs. Inc. v. United Constr. Corp.*, 2005 WL 378707, at *5 (Tenn. Ct. App. Feb. 16, 2005). "A breach of contract . . . is not in and of itself a deception, misrepresentation or unfairness under the [TCPA]." *Id.* As explained above in **§ III A**, when OCI entered into the Contract it promised to provide Plaintiff with workstations that had Xeon processors or something equivalent to or better than Xeon processors. In making this promise, OCI represented the workstations would be "of a particular standard, quality or grade, or...of a particular style or model." Tenn. Code Ann. § 47-18-104(b)(7). However, in making this promise OCI did not represent the workstations "*are* of a particular standard, quality or grade...or..of a particular style or model, [when they] *are* of another" *Id.* (emphasis added). OCI could not have made such a representation because the workstations did not exist when the Contract was executed. Therefore, OCI's contractual promise to provide workstations with Xeon processors did not violate the TCPA under § 47-18-104(b)(7).

With respect to the ordering and installation of the workstations, OCI could not have violated the TCPA under § 47-18-104(b)(7) because in ordering and installing the workstations, OCI did not make any representations about the workstations. *See* Tenn. Code Ann. § 47-18-104(b)(7); *Cf. Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 305 (Tenn. Ct. App. 1984) (finding violation of § 47-18-104(b)(7) because the defendant's agent represented that an aircraft was new when in fact it was used). Although the ordering and installation of the workstations with Pentium processors

may have breached the Contract, the ordering and installation did not violate the TCPA under § 47-18-104(b)(7).

However, OCI did violate the TCPA when it invoiced Plaintiff for the workstations. The Contract allowed OCI to invoice Plaintiff when it reached certain milestones. OCI invoiced Plaintiff for the staging, delivering, and installation of the workstations. In doing this, OCI implicitly represented the workstations were installed in compliance with the Contract (*See* Court File No. 222, Exh. K; Court File No. 224, Exh. U). Therefore, OCI represented to Plaintiff the workstations had Xeon processors when they in fact had Pentium processors. Stated in statutory terms, OCI misrepresented the "particular standard, quality or grade, or . . . style or model" of the workstations when it invoiced Plaintiff. Tenn. Code Ann. § 47-18-104(b)(7); *see Ganzevoort v. Russell*, 949 S.W.2d 293, 297 (Tenn. 1997) (stating "the [TCPA] is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices" (internal quotations and citations omitted)).

OCI argues even if it committed an unfair or deceptive act, Plaintiff has not suffered any injury as a result of the unfair practice or deceptive act.[12] A reasonable juror might conclude otherwise. The Pentium processors, as admitted by OCI, are slower than the Xeon processors and are not able to process as much data. This alone is enough for the Court to conclude Plaintiff was damaged when Plaintiff installed the Pentium processors. Further, since the Pentium processors are

_____

[12] OCI's damage argument seems out of place because Plaintiff has represented to the Court it is not seeking actual damages under Tenn. Code Ann. § 47-18-109(a)(1). Instead, Plaintiff is seeking rescission, statutory treble damages, and attorney's fees (Court File No. 247, p. 17, n.6). However, the Court will address the damages argument because damages may be appropriate if rescission is not an appropriate remedy. Also, the Court notes OCI does not address Plaintiff's claims for treble damages or attorney's fees in its motion for summary judgment. Therefore, the court will allow these claims to proceed to trial.

18

slower, they may have been the cause of the workstations running slow in the fall of 2004. Although additional software had been loaded on the workstations by Fall 2004, Plaintiff may have originally bargained for Xeon processors in case it needed to expand its CAD system or add additional software. It is not uncommon to purchase computer hardware with extra random access memory ("RAM"), speed, *etc.* in case future needs outpace current needs. Therefore, even if Pentium processors were good enough to run the OCI CAD system, Plaintiff may still have been damaged by the installation of Pentium processors.

Lastly, OCI contends if it violated the TCPA, rescission of the Contract is not an appropriate remedy. "Rescission of a contract made as a result of an unfair or deceptive trade practice is a proper remedy available under the [TCPA]." *Smith v. Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 13 (Tenn. Ct. App. 1992); *see also Lien v. Couch*, 2004 WL 343905, at *8 (Tenn. Ct. App. Feb. 23, 2004) (stating "[t]he TCPA clearly contemplates that unfair and deceptive practices may induce consumers to enter into contracts that, on their face, are enforceable. Consequently, a buyer who is induced by such acts has several remedies, including rescission of the resulting contract"). Typically, rescission is "available where the contract was induced by fraud or duress." *Lamons v. Chamberlain*, 909 S.W.2d 795, 800 (Tenn. Ct. App. 1993). Rescission "is intended to return the parties to the positions they were in before the transaction took place." *Id.* "Rescission is an equitable remedy, it is not enforceable as of right, and the decision of whether to grant this extraordinary remedy rests in the sound discretion of the trial court." *Fayne v. Vincent*, 2004 WL 1749189, at *4 (Tenn. Ct. App. Aug. 5, 2004).

In OCI's current motion, it does not attempt to prove the Contract was not made as a result of its promise to provide Plaintiff with Xeon processors. Instead, OCI simply argues rescission is

an inappropriate remedy because the parties cannot be returned to the positions they were in before the transaction took place. In support of this argument, OCI avers the workstations were used by Plaintiff for two years, the workstations are nearing obsolescence, and some of the workstations were donated to another public agency (Court File No. 224, p. 23). The Court must reject OCI's motion for summary judgment on this ground for two reasons. First, OCI has presented insufficient evidence to support its contentions. OCI does not cite one deposition, affidavit, or piece of documentary evidence to support its contention the workstations are obsolete and so worn they cannot be returned to OCI in the same condition in which Plaintiff received them. As for the donation of the workstations to another public agency, Plaintiff states only one workstation was donated and it may not seek rescission for that workstation (*See* Court File No. 247, p. 17). Thus, Defendants have not presented sufficient evidence for the Court to conclude as a matter of law rescission is an inappropriate remedy.

Second, on August 3, 2005 the Court held a hearing and allowed the parties to present evidence and argument on Plaintiff's motion in limine to exclude Defendant's expert witness Frank Koperda ("Koperda") (*See* Minutes, Court File No. 127). At this hearing, Plaintiff stated it was only seeking a rescission of the Contract. OCI did not object to Plaintiff's claim for rescission at the hearing. The Court relied on Plaintiff's decision to only seek rescission of the Contract and concluded Koperda's testimony was not relevant to any matter at issue in this litigation (Court File No. 137, pp. 7-8). If OCI felt rescission was an inappropriate remedy it should have argued as such at the hearing or shortly after the Court issued its opinion. Instead, OCI waited until November 14, 2005 to argue rescission was an inappropriate remedy. Since OCI failed to make this argument earlier, the Court believes summary judgment is inappropriate on this ground. With that said, the

Court will allow OCI to raise this argument at trial. However, if rescission is not an appropriate remedy, then Plaintiff will be allowed to seek actual damages.

In light of the previous reasoning, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiff's and OCI's motion for summary judgment. The Court will **DENY** Plaintiff's motion and **GRANT** OCI's motion with respect to Plaintiff's TCPA claims under § 47-18-104(b)(7) based on OCI's contractual promise to install Xeon processors and the ordering, delivery, and installation of the workstations. Also, the Court will **GRANT** Plaintiff's motion and **DENY** OCI's motion on Plaintiff's TCPA claims under § 47-18-104(b)(7) based on OCI's invoicing Plaintiff for the staging, delivery, and installation of the workstations. Lastly, the Court will **DENY** OCI's motion for summary judgment based on its remedy arguments.


IV.  <u>**CONCLUSION**</u>

For the reasons already explained, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiff's motion for summary judgment (Court File No. 221). Also, the Court will **GRANT IN PART** and **DENY IN PART** OCI's motion for summary judgment (Court File No. 223). Specifically the Court will (1) **GRANT** Plaintiff's motion for summary judgment on its TCPA claims under § 47-18-104(b)(7) based on the invoicing of the staging, delivery, and installation of the workstations; (2) **DENY** Plaintiff's motion for summary judgment on its TCPA claims under § 47-18-104(b)(7) based on OCI's contractual promise to provide Plaintiff with Xeon processors and the ordering, delivery, and installation of the workstations; (3) **GRANT** OCI's motion for summary judgment on Plaintiff's TCPA claims under § 47-18-104(b)(5) and § 47-18-104(b)(27); (4) **GRANT** OCI's motion for summary judgment on Plaintiff's TCPA claims under § 47-18-104(b)(7) based on

OCI's contractual promise to provide Plaintiff with Xeon processors and the ordering, delivery, and installation of the workstations; (5) **DENY** OCI's motion for summary judgment on Plaintiff's breach of contract claim; (6) **DENY** OCI's motion for summary judgment on Plaintiff's TCPA claims based on the applicable statute of limitations; (7) **DENY** OCI's motion for summary judgment on Plaintiff's TCPA claims based on OCI's remedy arguments; and (8) **DENY** OCI's motion for summary judgment on Plaintiff's TCPA claims under § 47-18-104(b)(7) for the invoicing of the staging, delivery, and installation of the workstations.

An Order shall enter.

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**